State v. Adams Lumber Co.

---

STATE OF NEBRASKA V. ADAMS LUMBER COMPANY ET AL.

FILED APRIL 23, 1908. No. 14,685.

1. **Monopolies: AGREEMENT IN RESTRAINT OF TRADE.** An agreement between retail lumber dealers, whereby one dealer agrees to "protect" the other by asking a higher price than the other for the same bill of lumber submitted to both for prices, is in violation of the statute.

2. ———: ———: INJUNCTION. An agreement made by a number of the retail lumber dealers in a county to sell lumber and building materials within the county at certain fixed prices and to divide territory is illegal and void as in restraint of trade and competition, and will be restrained and enjoined.

3. ———: ———: ———. Under the circumstances disclosed in this

case, *held* that the action of the secretary of the Nebraska Lumber Dealers Association in a number of transactions detailed in the opinion was in violation of law as tending to prevent or preclude free competition in the sale of lumber and building materials in this state and being in restraint of trade, and that, under the facts disclosed, the officers and directors of said association are chargeable with knowledge of such acts. *Held, further,* That all such proceedings upon his part should be perpetually enjoined, and that the defendant association and its officers and directors should also be perpetually enjoined from doing or performing, and from permitting or allowing said secretary or his successors or any officers of said association to do or perform, any such unlawful acts, and from carrying on any such practices or proceedings in violation of the statutes of this state prohibiting combinations in restraint of trade.

ORIGINAL suit by the state to restrain the defendants from unlawfully combining in restraint of trade. *Injunction allowed as to certain defendants.*

*W. T. Thompson, Attorney General, W. B. Rose* and *H. M. Sinclair,* for plaintiff.

*Baldrige & De Bord, E. J. Clements, John S. Kirkpatrick, Courtright & Sidner, Flansburg & Williams, Hubbard & Burgess, Strode & Strode, E. B. Perry, R. R. Dickson, W. Switzler, R. E. Evans* and *Charles J. Traxler, contra.*

LETTON, J.

This action was brought by the attorney general of the state of Nebraska under the provisions of the anti-trust act of the legislature of 1905, known as the "Junkin Act" (laws 1905, ch. 162). The defendants, who are several hundred in number, are corporations, partnerships and individuals who are engaged in the business of dealing in lumber in the state of Nebraska, and it is alleged that they own and operate more than 700 lumber yards in the state doing at least 90 per cent. of the retail business in lumber and cement and other building materials.

The petition charges: "That said defendants are now

and for the last several years have been intentionally, wilfully and unlawfully combining, conspiring and conniving together and with each other and with other persons and corporations unknown to plaintiff for the purpose of restraining trade and commerce in lumber and building materials and monopolizing and attempting to monopolize said trade and commerce within said state, and for the purpose of dividing among themselves the said trade and commerce in certain districts and localities within said state, and for the purpose of fixing the prices at which they would sell to the public lumber and building materials, and for the purpose of preventing competition among lumber dealers, and for the further purpose of destroying competition and driving out of business competitors in said line of business; all of which was wilfully and unlawfully done by said defendants to the end that they and each of them might have a monopoly of said trade and commerce, and that they and each of them enjoy unreasonable and unconscionable profits from the operation of their said business; that in pursuance of the combination, pool and conspiracy aforesaid said defendants are now and have been able for the last several years to control and fix the prices of lumber and building materials generally throughout the state of Nebraska, and to restrict trade and commerce in said commodities, and to destroy competition and to drive out of business competitors in said business." The petition further charges that to aid in carrying out its purposes the defendants organized what is known as the "Nebraska Lumber Dealers Association," of which a number of the defendants constitute the officers; that no person or corporation can become a member of said association unless he or it is "regularly engaged in the retail lumber trade, carrying an assorted stock of lumber, sash, doors and other building material reasonably commensurate with the demands of his community, and that wholesale dealers who are in sympathy with the association may become honorary members thereof." The articles of the association are set

forth at length, and it is charged that, "as interpreted, enforced and practiced by the members and officers of said association, they result in giving to the officers and members a monopoly in the retail lumber business, and allow them to destroy competition and to restrain trade and commerce within the state." The petition further charges that the secretary issued a bimonthly list of lumber dealers within the state of Nebraska, showing those who are and who are not members of the association, the purpose being to advise wholesale dealers as to which lumber dealers are members of the association and which are not members and therefore not entitled to the same terms and treatment as the regular members. It is further charged that the understanding was that members of the association who had lumber yards in the same city or village should charge to the consumer the same prices for lumber and building materials, which understanding has been and now is being kept by such members. The petition further charges that by means of the monopoly and combination so formed the defendants have unlawfully increased the prices of building materials and are destroying competition in the lumber trade of Nebraska. The prayer is for an injunction to restrain the defendants from connection with or participation in the Nebraska Lumber Dealers Association; that the association be dis-. solved; that the defendants who are domestic corporations be ousted from their corporate powers and franchises, and that each and all of the defendants be enjoined from in any manner preventing or limiting competition in the sale of lumber and building materials, from fixing or controlling the prices thereof, or from entering into any agreement to carry out any restriction of trade.

The answers of the several defendants, except for some unimportant admissions, amount in effect to a general denial of the allegations of the petition. The cause was referred to the Honorable A. M. Post, as referee, to take the evidence and report his conclusions of fact and law. The referee proceeded to take the testimony and hear the

case, and filed a report, which in its amended and final form is as follows:

''FINDINGS OF FACT.

"(1) The Nebraska Lumber Dealers Association, an incorporated voluntary association, was organized in or previous to the year 1892, being composed of retail lumber dealers of Nebraska as active members, with wholesale dealers and manufacturers and their representatives as honorary members.

"(2) On the 22d day of January, 1903, said organization adopted new and amended articles of association which, so far as material to this controversy, are as follows:

" 'We realize the convenience, if not the necessity, of the retail lumber dealers to every community, and we are interested in the promotion of the general welfare and the perpetuation of the retail lumber business. We recognize the absolute right of every person, partnership or corporation to establish and maintain as many retail yards as he or it may see fit. We recognize the right of the manufacturer and wholesale dealer in lumber products to sell lumber in whatever market, to whatever purchaser, and at whatever price they may see fit. We also recognize the disastrous consequences which result to the legitimate retail lumber dealer from direct competition with wholesalers and manufacturers, and appreciate the importance to the retail dealer of accurate information as to the nature and extent of such competition where any exists. And, recognizing and appreciating the advantage of co-operation in securing and disseminating any and all proper information for our mutual convenience, benefit or protection, we have organized this association and have adopted the following articles for the government of our affairs:

" 'Article I.

" 'Name and Territory.

" 'The name of this organization shall be the Nebraska Lumber Dealers Association, and the territory embraced by it shall be the state of Nebraska and that part of

states adjoining and tributary to it where interests are mutual.

## " 'Article II.
## " 'The Object.

" 'The object of this association is and shall be to secure and disseminate to its members any and all legal and proper information which may be of interest or value to any member or members thereof in his or their business as retail lumber dealers.

## " 'Article III.
## " 'Limitations and Restrictions.

" 'Section 1. No rule, regulations or by-laws shall be adopted in any manner stifling competition, limiting production, restraining trade, regulating prices or pooling profits.

" 'Section 2. No coercive measure of any kind shall be practiced or adopted toward any retailer, either to induce him to join the association, or to buy or to refrain from buying of any particular manufacturer or wholesaler; nor shall any discriminatory practices on the part of this association be used or allowed against any retailer for the reason that he may or may not be a member of the association, or to induce or persuade him to become such member.

" 'Section 3. No promises or agreements of any kind shall be requisite to membership in this association, nor shall any penalties be imposed upon its members for any cause whatsoever.

## " 'Article IV.
## " 'Membership.

" 'Section 1. Regular Members. Any person, firm or corporation within the territory of this association regularly engaged in the retail lumber trade, carrying an assorted stock of lumber, sash, doors and other building material reasonably commensurate with the demands of his community, shall be considered a retail lumber dealer, and be eligible to membership in this association. Each member entering one yard shall pay annual dues of $7,

payable in advance. Any member desiring to enter more than one yard shall pay additional dues for each additional yard.

" 'Section 2. Honorary Members. Any wholesale dealer, manufacturer or manufacturer's agent, who shows himself to be in full sympathy with this association and its members, may become an honorary member, and receive the benefits of such advertisement as the association prescribes in listing such honorary members in each bulletin issued to the trade by the association, by paying $5 annually into the association.

" 'Article V.
" 'Officers.

" 'Section 1. The affairs of the association shall be managed by a board of ten directors, including the president, vice president, treasurer and secretary, who shall be *ex officio* members thereof. The secretary shall issue bimonthly a printed list of all members of the association in good standing, and shall mail copy thereof to each member. He shall also mail a copy of said list to the secretaries of such other associations as will reciprocate.  *  *  *

" 'Section 4. Executive Committee. The president, vice-president and secretary, *ex officio*, are constituted the executive committee of this association. In all matters relating to complaints made to this association between the sessions of the board of directors the said committee shall have the same power as those conferred upon the board of directors. Upon request of the secretary said committee shall convene and adjust such matters as are not clearly defined by the articles and by-laws, or such other questions as he deems of great importance to the association.

" 'Article VI.

" 'Section 1. Reports to Secretary. Any member of this association having knowledge of a sale by a manufacturer or wholesale dealer or his agent to a consumer within the territory of such member may notify the secretary of this

association in writing, giving as full information in reference thereto as practicable, such as date or dates of shipment and arrival, car number and initials, original point of shipment, names of consignor and consignee, and purpose for which the material was or is to be used, and such other particulars as may be obtainable. Such notice, if filed at all, must be sent with or without information in. detail, within thirty days after receipt of shipment at point of destination, and no notice shall be filed of any such sale or shipment occurring within fifteen days after date of said member's certificate of membership (said membership to date from the first issue of the membership list succeeding the acceptance of his application). Upon receipt of such written notice the secretary shall immediately verify such report, as far as practicable, and under the direction of the board of directors shall notify the members of the association of such sale or shipment by such manufacturer or wholesaler.

" 'Section 2. Exceptions. No notices shall be filed of the following sales or shipments, the same being regarded as wholesale trade: To railroad or transportation companies, packing houses, regular dealers in grain operating a line of elevators, warehouses or corncribs, state or United States governments, regular bridge building companies, extensive coal mine operators, manufacturers where all material purchased enters directly into the article manufactured, or becomes a part of the article offered for sale, or used in boxing, crating or shipping the same; provided that none of those named are engaged as contractors in the erection of buildings for other than their own use. Also sales of desks, bank or drug-store fixtures, or in the case of house mill work, where plans, details and specifications are furnished by owner, or where the strictly special work, exclusive of regular stock, sash, doors, base, casings, columns, mouldings, flooring and finishing lumber for cornice and shelving, amounts to $500 or more.

" 'Section 3. All sales or shipments made to customers by commission merchants, agents or brokers, shall be con-

sidered as though the same were made directly by the manufacturer or wholesaler from whom such commission merchant, agents or brokers secure such lumber or shipments.

" 'Section 4. Each member, when he joins this association, and once each year thereafter (and oftener if the board of directors shall request it), is expected to furnish the secretary, when called upon to do so, a list of those manufacturers and wholesalers and their agents from whom he makes purchases of lumber and other building material.'

"On the 8th day of February, 1906, said articles of association were further amended by striking therefrom the last clause of section 1 of article 6 thereof, to wit: 'And under the direction of the board of directors shall notify the members of the association of such sale or shipment by such manufacturer or wholesaler.'

"(3) The alleged purpose, and, so far as the evidence discloses, the real purpose, of such amended articles was to conform said association in its purposes and practices to the anti-trust laws of Nebraska as expounded by this court in the case of *Cleland v. Anderson*, 66 Neb. 252.

"(4) Although said articles of association were not signed by the members of said association, the defendants, except as hereinafter stated, have voluntarily paid the fees and dues prescribed by said articles, and have otherwise conformed to the rules and regulations of said association, and have continuously enjoyed the privileges and benefits conferred, and have thereby assumed the obligations of members of said association.

"(5) On and previous to the 5th day of May, 1904, the Barnett Lumber Company, a corporation engaged in business as a retail lumber dealer at McCook, Nebraska, combined with the W. C. Bullard Lumber Company, a corporation engaged in business as a retail lumber dealer at McCook, for the purpose of regulating the prices of lumber and other building materials, and for the division of trade, in said city and adjacent territory; and said

defendant and the said W. C. Bullard Lumber Company, a nondefendant, by means of such combination did, at and before the date aforesaid, control the prices of lumber and other building materials in said city and territory. There is also evidence tending to prove like combinations for the purpose of regulating prices by certain defendants, and by certain defendants and strangers to this record, within the counties Seward, York, and Cass, but the evidence fails to connect the Nebraska Lumber Dealers Association with such combinations or either thereof, and does not sustain the charge of unlawful combination against such other defendants.

"(6) Except as otherwise hereinbefore stated, the evidence fails to prove any agreement, combination or conspiracy by all or any of the defendants to pool profits, to regulate prices of building material, or for the division of territory for the purpose of trade; and the claim of the state is predicated wholly upon the alleged unlawful combination or agreement of defendants to drive out of business wholesalers and manufacturers dealing directly with consumers, and to prevent such wholesalers and manufacturers from dealing directly with consumers.

"(7) Complaint has been made from time to time by members of the association to the secretary thereof on account of the consignment of building material in carload lots to nondealers, and the secretary has, by correspondence, protested to such consignors against such practice as violative of the 'ethics of the trade.' But the evidence fails to prove that the fact of such complaints or of such consignment, or the names of the consignors, or either or any thereof, were communicated to or known by other members of the association. And the evidence fails to prove the existence of any rule, regulation, usage or understanding for the furnishing of such information, or for the imposing of any penalty whatever for the sale by wholesalers or manufacturers to nondealers; and the members of said association are, and have been at all of

29

the times named in the petition, at liberty to purchase building material in any and all markets and from any and all dealers, and are not, and have not been, bound by any rule, regulation or understanding to withdraw or withhold patronage from wholesalers dealing directly with consumers.

"(8) The Nebraska Lumber Dealers Association has never transacted any business, and the members thereof, including these defendants, except as hereinbefore stated, were at the date of the commencement of this action engaged in competition among themselves as dealers in lumber and other building material.

"(9) The evidence fails to prove any agreement or combination by the defendants or any of them, or between any of the defendants and strangers to this record, except as hereinbefore stated, to drive out of business or to place any restriction upon or interfere with the business of lumber dealers who are nonmembers of the Nebraska Lumber Dealers Association, or to compel such nonmembers to affiliate with said association.

"(10) The defendants, except as herein stated, were not at the date of the commencement of this action combining or conspiring together or with others for the purpose of restricting trade or commerce, or of monopolizing any part of the trade and commerce of the state of Nebraska.

"(11) The defendants, except as above found and stated, were not at the date of the commencement of this action monopolizing any part of the trade and commerce of the state of Nebraska.

"(12) The following named defendants, to wit, the S. A. Foster Lumber Company; the Searle & Chapin Lumber Company; George A. Hoagland; the Bowman-Kranz Lumber Company, and Thomas Ostergard & Company, are not, and were not at the date of the commencement of this action, affiliated with the Nebraska Lumber Dealers Association.

"CONCLUSIONS OF LAW.

"1. The purposes of the Nebraska Lumber Dealers Association as declared in its articles of association are not unlawful.

"2. The declared purpose of said association being consistent with the provisions of the anti-trust laws of Nebraska, the defendants are not, from the mere fact that they are members of said association, chargeable with acts violative of such laws done without their knowledge or consent by fellow members thereof.

"3. The facts as proved and found do not, except as herein otherwise stated, amount to an unlawful trust as defined by statute of Nebraska.

"4. The facts as proved and found do not, except as herein otherwise stated, show any agreement, combination or conspiracy in restraint of trade as defined by statute of Nebraska.

"5. The facts as proved and found do not, except as herein otherwise stated, show any agreement, combination or conspiracy to monopolize any part of the trade and commerce of the state of Nebraska.

"6. The defendants, except as herein otherwise stated, were not at the date of the commencement of this action guilty of monopolizing any part of the trade and commerce of the state of Nebraska.

"7. The unlawful combination between the defendant, the Barnett Lumber Company, and the W. C. Bullard Lumber Company is presumed to have continued to the commencement of this action, and the state is, as against said defendant, entitled to judgment as prayed.

"8. Except as to the defendant last above named, the petition should be dismissed.

"Dated April 11, 1907.        A. M. POST, Referee."

To these findings of fact and conclusions of law the state and the defendant Barnett Lumber Company filed exceptions, upon which arguments have been had and briefs submitted, and the question now before us is whether the report of the referee should in all things be

adopted and judgment rendered accordingly, or whether the exceptions should be sustained.

The report of the referee may properly be considered in two general divisions; that part which treats of the organization, purposes and acts of the Nebraska Lumber Dealers Association, and that portion which is concerned with certain local combinations alleged to have been formed by some of the defendants in unlawful restraint of trade within the state.

1. We will first consider the evidence relating to the acts of the Nebraska Lumber Dealers Association and those of its secretary. The Association was organized about the year 1892. At the time it was organized and for a period of years thereafter one of its expressed objects was to prevent the competition of wholesale dealers in selling directly to contractors and other consumers, and to prevent wholesalers from selling to dealers who did not carry a stock of 75,000 feet and maintain a permanent yard.

The legality of the association was questioned in the case of *Cleland v. Anderson*, 66 Neb. 252, and it was there held that its objects and purposes were unlawful and in contravention of section 1, ch. 91a, Comp. St. 1907 (Ann. St. 1907, sec. 12000). The opinion in this case was handed down November 6, 1902. In the latter part of January, 1903, the association held its 13th annual convention at Lincoln, Nebraska. In the printed report of that meeting is contained the president's address, from which the following is quoted: "The board of directors has so successfully manipulated the affairs of the association that serious contention has not arisen, and all kinds of differences, all claims and all complaints have been adjusted to the seeming satisfaction of all concerned, and the association is now at peace with all the world *excepting a few poachers;* but as to them there *has been and is still being maintained an effective warfare.* This element is still troublesome, but is becoming rapidly subservient, and several jobbers who were hostile a few

months since are now enrolled with us and rendering valuable .aid in the conquest of others." The president further speaks of the case of *Cleland v. Anderson, supra,* disclaims any intention to be other than law abiding, and continues: "Desiring to place ourselves right in the eyes of the law, as we have ever been from the moral standpoint, important measures will be presented at this meeting for your consideration." This referred to amended articles of association which were presented and adopted at the meeting. These articles are set forth at length in the referee's report. They remained without change until the 8th day of February, 1906, when they were amended by striking from the last clause of section 1 of article 6 the provision that the secretary "under the direction of the board of directors shall notify the members of the association of said sale or shipment by such manufacturer or wholesaler."

A large mass of evidence both oral and documentary has been submitted with reference to the manner of carrying on the affairs of the association since 1903 until this time. The testimony of the officers and directors of the organization is, in substance, that those purposes of the association which are not prohibited by law and which are advantageous and commendable in themselves have been the principal object of its activities since that time, and specific and categorical denials have been made by these witnesses of any practices, rules, actions or operations on the part of the executive officers or of the board of directors or of the members of the association, the object of which is anywise in contravention of the statutes. It appears, however, that for ten years, from 1892 to 1902, the practices of the association were of a nature clearly at this time unlawful, and that secretary Critchfield has continued his activities very much along the same line as before the change of articles took place. The articles of the association, as amended and now existing, recite, as one of the reasons for the existence of the association,

"the disastrous consequences which result to the legitimate retail lumber dealer from direct competition with wholesalers and manufacturers," and "the importance to the retail dealer of accurate information as to the nature and extent of such competition where any exists." Another reason given is "the advantage of co-operation in securing and disseminating any and all proper information for our mutual convenience, benefit or protection." It was mainly for these purposes that the association was originally organized. The provisions that members must communicate to the secretary any matters within their knowledge of "poaching" was amended so as to make it permissive in form. But the amendments left intact the provision for notice to be given to the secretary of a sale *"within the territory"* of any member. These notices were to be given in case of a sale by a manufacturer or wholesale dealer or his agent to a consumer within the territory of such member, and were to contain "as full information in reference thereto as practicable, such as date or dates of shipment and arrival, car number and initials, original point of shipment, names of consignor and consignee, the purpose for which the material was or is to be used, and such other particulars as may be obtainable." The notices, if sent, must be within 30 days after the receipt of the shipment at the point of destination. The evidence shows that this plan or system of keeping tab upon sales by wholesalers to other than "regular dealers" was carried out with considerable frequency by members of the association, and that the enforcement of the "ethics of the trade" against "poachers" was carried on by Secretary Critchfield after the amendments the same as had been done before. But, instead of notifying all the members of the association of the encroachments of the poacher," in order that they may withdraw their patronage from the said "poacher," the secretary takes the matter up with the violator of the "ethics of the trade" and calls for an "explanation."

The evidence shows that associations of retail lumber

dealers of much the same character as the Nebraska association exist in nearly all the states in the Mississippi Valley, and that, as with this association, the most active officer in their respective organizations seems to be the secretary. An association of secretaries exists, denominated the "Secretaries' Bureau of Information," which has its headquarters in Chicago, and of which one W. S. Hotchkiss seems to be the head. Hotchkiss attended a meeting of the Nebraska Lumber Dealers Association and explained the method of operation of this bureau of information, and the evidence shows that some arrangement was made by which each member of the Nebraska association became entitled to the services of this secretaries' bureau, and by this means pressure was brought to bear upon the wholesalers and manufacturers residing or doing business in states occupied by other associations. The Nebraska association sent delegates to the meetings of the secretaries' bureau and contributed to its support as late as July, 1906. An instance of the actual working of this bureau is as follows: A complaint was made to secretary Critchfield by a Hebron lumber company against a Chicago sash and door concern. This complaint was forwarded to Hotchkiss at Chicago to send to the offending Chicago manufacturer, with a request for an explanation. Afterwards the complaint, the letter of Hotchkiss to the Chicago company, and their reply thereto were returned by Hotchkiss to Critchfield, and a few days later Hotchkiss advised Critchfield as follows: "June 21, 1904. Mr. Bird Critchfield, Sec., Lincoln, Neb. Dear Sir: I enclose supplementary files in the complaint of the Hebron (Neb.) dealers v. Morgan S. & D. Co., Chicago, including their reply to my late communication to them. I think it would be wise for the Hebron dealer now to write the Morgan company making demand for 10 per cent. compensation for this shipment. We as an association or bureau dare not do it, but the injured dealers cannot be criticized for demanding it, whether they get it or not. They can plead the action of the Mississippi Valley

State v. Adams Lumber Co.

Manufacturers Association, who by resolutions have asserted the justice of such a claim and bound themselves by their act to pay them. I have recently through their secretary, Mr. Rhodes, collected $35 on such a shipment. Very truly yours, Geo. W. Hotchkiss, Secretary." The evidence fails to show whether this advice was taken, and whether any compensation was ever made to the dealers at Hebron. This transaction was in 1904, after the *Cleland* decision.

A typical case is set forth by certain correspondence between some lumber dealers in Havelock, secretary Critchfield and the offending wholesaler. In the first letter the Havelock dealers report to Critchfield the shipment of a car of yellow pine to that place, suggesting that they think it came from the Monarch Lumber Company, and was sent through a Lincoln firm, and asked Critchfield to let them know as soon as possible, because they also had an order with the Monarch people, and "that if it does this kind of business we will try and find another mill to place our orders with." Next appears a letter from Critchfield, as secretary of the association, to the Monarch Lumber Company at St. Louis, as follows: "Gentlemen: Notice has been received at this office that you shipped car No. 38,154 C., M. & St. P. to James Candy, Havelock, Nebraska, upon the order of the Godfrey Lumber and Coal Company of Lincoln, Nebraska. Please explain shipment, and oblige, yours very respectfully, ——, Secy." The next letter is in reply to this from the lumber company. It is apologetic in its nature, and in substance is to the effect that they shipped the car to the Godfrey Lumber and Coal Company, and not to Candy; that when the order was received they supposed that company had a yard at Havelock, and, hence, made the shipment. The letter concludes: "We have no intention whatever of infringing on the rights of any dealer. On the contrary we wish to protect them to the full extent, and if error has been made in this case we assure you that it was not intentional. Trusting that you will understand

this explanation as made, we are, yours very truly, Monarch Lumber Company, Trowbridge." The next letter is from Critchfield to the Havelock dealer, inclosing the explanatory letter. A letter follows from them to Critchfield, saying they will pass the matter, but if that company wish to sell them any more they will have "to cut out shipments to parties who order stuff where they did not have a yard." The last letter is from Critchfield to the Monarch Lumber Company, saying the Havelock member had written him "that the explanation of this occurrence was sufficient to have the matter passed without further notice." This correspondence took place early in 1905. But this practice did not cease with the taking effect of the Junkin act in July, 1905, as the following copies of letters from Critchfield's letter-book show: "7-1, 05. Clark & Nickerson Lbr. Co., Everett, Wash. Gentlemen. Notice has been received that your company shipped to Geo. M. Adams, Alliance, car of lumber which was used for W. D. Runer in a store building. Please advise why you shipped to Mr. Adams, as he is not a lumber dealer at Alliance. Yours respectfully." "Aug. 23-05. Chas. Keys & Co., Wilsonville, Neb. Gentlemen: Yours of the 16th inst. received during my absence, and I note what you say about this man Dolph Ferrin of Beaver City. This is a new deal, and I am at a loss to know just how to locate this firm that this man represents. There will have to be some pretty slick work done to find out who is shipping the stuff in the south. Can't you find out through the bank to whom the drafts or pay is paid, or of the railroad agent how is (it) was marked on the bill of lading. Tell Phelps to try to work some deal at Beaver City, and if your cars come in there try to locate the shipper, and let me know. Yours respectfully." "Sept. 4th, '05. Coolidge-Shussler Co., Floodwood, Minn. Gentlemen: Just received letter from the regular lumber dealer at Cody, Neb., saying that your company had made two shipments to that point to other than the regular dealer there. Will you please advise the circum-

stances surrounding these shipments and whether or not
you make a practice of selling to other than regular deal-
ers. Yours respectfully."

These transactions are illustrative of many others
which are in evidence. The usual procedure seemed to
be that, when a local dealer heard of a shipment or a
sale by a wholesaler to some person in his locality who
was not a retail lumber dealer, he would immediately
notify Critchfield, giving all the particulars he could ob-
tain, in some cases being advised by Critchfield that the
details were lacking and to endeavor to find out from
the local bank through whom the draft was paid, or from
the local railroad agent from where the lumber came, so
that Critchfield might take the matter up with either the
wholesaler direct or through the aid of the secretaries'
bureau. When definite information was obtained, the sec-
retary would write a letter to the wholesaler, asking for
an explanation, and in several instances in evidence re-
ceived satisfactory explanations, accompanied usually
with an apology from the offending jobber and a promise
to do better in the future. There is no evidence that notice
was given to the members of the association generally as
to whom the offending wholesalers or manufacturers were,
and the entire transaction seems to be exemplified by the
typical cases mentioned. There is no doubt that the ef-
fect of the communication upon the offending wholesaler
was in all probability as great as if the result of con-
tumacy on his part would be the publication of his name
to each member of the association, but no penalty was
sought to be collected from him, nor was he compelled to
pay to the association or any member thereof any profit,
fine or compensation on account of the sale. There is no
evidence that shows that these complaints in actual prac-
tice were ever brought before the directors or members
of the executive committee of the Nebraska association,
or before the association as a body, but they were appar-
ently attended to by Critchfield under his general author-
ity as secretary of the association. One of the benefits

of the association held out by Critchfield to inquiring lumber dealers was the fact that through the operations of the association "poaching" had been well nigh terminated in this state. The fact seems to be that whatever success there was in this direction after the change of the articles of association was accomplished by the acts and doings of Critchfield clothed, as he apparently was, with the aggregated power of the associated lumber dealers of this state to restrict and injure the business of the manufacturer or jobber within the state. Since the repeal of the provision requiring the secretary to notify the members of "poaching" transactions, the only duty imposed upon the secretary in that behalf is that on receipt of a notice from a retail dealer he shall immediately verify the report, as far as practicable. While this is as far as the articles of association go, the notice would be useless if it remained buried in the archives of the secretary, and we think that under the articles as a whole it is intended that one of the duties of the secretary shall continue to be, as it had been before, to call the "unethical" sale to the attention of the offending wholesaler, and to endeavor to prevent and put a stop to such sales in the future. The evidence shows other details of organization tending to the same end, the prevention of competition between the wholesaler or jobber and the retail dealer in the sale of lumber, and the restraining of the power and ability of the individual purchaser to buy from any but the local dealer.

It is to be noted also that the same course is pursued with reference to the trade in cement. In cities and towns many miles of cement sidewalks are to be and are being built. Also many buildings are being erected of cement blocks manufactured by the builders, whether contractor or owner, but the association holds itself ready to call upon any manufacturer of cement for an "explanation" should he sell his product to any one except a regular lumber dealer. The testimony shows that wholesalers have refused to fill large orders to consumers for the reason that they dare not do it.

At the common law, contracts and combinations in restraint of trade were not in all cases illegal or void and unenforceable. It was only such contracts as created an unreasonable restraint of trade which the courts refused to lend their aid to carry into effect or award damages for the breach thereof. This is the doctrine of *Mogul Steamship Co. v. McGregor, Gow & Co.*, 21 L. R. Q. B. Div. 544; *Bohn Mfg. Co. v. Hollis*, 54 Minn. 223; *Scottish Co-operative Wholesale Society, Limited, v. Glasgow Fleshers' Trade Defence Ass'n*, 35 Sc. L. R. 645; *MacCauley Bros. v. Tierney*, 19 R. I. 255, 37 L. R. A. 455.

The act under which this suit is brought is in its leading provisions almost a literal transcript of the federal Sherman anti-trust act of 1890. One of the questions most controverted in cases arising under the provisions of the Sherman act was whether the law prohibited all contracts and combinations in restraint of trade, or whether those alone which were unreasonable in their nature were inhibited by its provisions. It was contended that the common law meaning of the term "contract in restraint of trade" included only contracts which were in unreasonable restraint of trade, and that the use of the term in the statute was in its common law signification. But it is pointed out in the opinion by Mr. Justice Peckham in *United States v. Trans-Missouri Freight Ass'n*, 166 U. S. 290, that contracts in restraint of trade may be either reasonable or unreasonable; that "a contract may be in restraint of trade and still be valid at common law"; but that, "by the simple use of the term 'contract in restraint of trade,' all contracts of that nature, whether valid or otherwise, would be included, and not alone that kind of contract which was invalid and unenforceable as being in unreasonable restraint of trade. When, therefore, the body of an act pronounces as illegal every contract or combination in restraint of trade or commerce among the several states, etc., the plain and ordinary meaning of such language is not limited to that kind of contract alone which

is in unreasonable restraint of trade, but all contracts are included in such language, and no exception or limitation can be added without placing in the act that which has been omitted by congress." This language is pertinent to the act under consideration so far as trade or commerce within the state is concerned, since the Nebraska law is almost a literal copy of the Sherman act, changing only its field of operation. In *Northern Securities Co. v. United States,* 193 U. S. 197, 331, the Sherman law was held to embrace and declare to be illegal every contract, combination or conspiracy of whatever form, of whatever nature, and whoever may be parties to it, which directly or necessarily operated in restraint of trade or commerce. This is the proper construction to be placed upon our statute, and if the organization of the Nebraska Lumber Dealers Association directly or necessarily operates in restraint of trade and commerce in lumber and building material within this state it is an unlawful combination.

In order to determine whether the Nebraska Lumber Dealers Association is a combination in restraint of trade we must consider both the expressed purpose of the association and its actual operations. The articles of association, except as to the plan for suppressing "poaching," and the declared purposes of the association, as they now stand, do not run counter to the statute. Since the acts recited whose legality is doubtful were performed by the secretary of the association in his official capacity, the question presented is whether it is unlawful for the secretary of the association to do that which if done by the lumber dealer himself would be absolutely within his rights and in accordance with law. There can be no question but that, if a retail lumber dealer found that a sale had been made by a wholesaler with whom he dealt to a consumer or contractor in his immediate locality, he might lawfully write to that wholesaler complaining of the same and informing him that, if he carried on such competition, he would terminate business relations with

him. There is neither in law nor morals anything to prevent the dealer doing this for himself, or having it done for him by any other person whom he may select. This being the case, is it unlawful for a large number of retail dealers to combine together for this purpose, and to select one person as an agent for all of them who shall forward such complaints of this nature as any one of them may have? Neither the members nor the officers of the association have taken any action, so far as the evidence shows, to prevent any member from buying from any wholesaler, whether he sold to contractors and consumers or confined his sales strictly to the retail dealers, except to create and foster a spirit in the trade against such action. Nor do the articles of association directly forbid any such purchase. Nevertheless, we think no candid and unprejudiced individual can read the evidence in this record without becoming convinced that the complaints sent by the secretary of the association to the various offending jobbers and wholesalers produced a much more powerful effect upon their minds than if the notices had been sent or complaints made by an individual dealer, or by Critchfield himself as agent for a single dealer. The effect of the combination and association was probably as great upon the jobber or manufacturer as if the ordinary and usual methods of the more highly organized associations of this character were being used, such as sending notices to the entire retail trade that a certain jobber was selling to consumers, or such as assessing and collecting a portion of the profit for the benefit of the retailer whose trade was injured, or by fining members of the association who bought from the offending jobber. Before the amendment of its articles the practices of this association were apparently those which, as a matter of common knowledge, have been the common practice of other associations of like character. The implied threat in Critchfield's letters of complaint could not, since the passage of the anti-trust acts, be legally carried out, but of this fact it is probable the wholesale trade was not

informed, hence the effect was just as great as if the association was still invested with all its ancient powers of offensive warfare. Should any wholesaler refuse to be bound by the "ethics of the trade" as promulgated by the association, he would find that the rules and plans of the association would soon curtail, if not destroy, his business with the members of the association without reference to their locality, whether near to or distant from the place where the "poacher" has accommodated an owner with the material necessary for the construction of his building. The pressure is made, not upon the "irregular" buyer, but upon the wholesaler who dares to transgress. In short, the purpose is to put it out of the power of the contractor or consumer to buy, unless he submits to the force of the association and makes his purchase from whom and where they may dictate, and at the price demanded by the "regular" dealer, and the object seems to have been largely accomplished throughout the state. The power of the association is not confined to Nebraska. It is closely allied with similar associations of many other states, and those combinations are made use of, as we have seen, for the purpose of aiding in the suppression of competition, and in restraint of trade and commerce in this state.

The most difficult question on this branch of the case is whether the association should be held responsible for all of Critchfield's acts as secretary. If the evidence showed that all of his activities, those recited as well as other acts of his set forth hereinafter, were carried on with the knowledge of its officers and as a part of the general purposes of the organization, we would have no hesitation in holding that it had violated the law. The conviction that his conduct in upholding the "ethics of the trade" has trespassed upon the field forbidden by the statute has been arrived at from the whole record, not from an isolated instance, but from a multitude of circumstances and details throughout the case. But, on the one hand, there is positive testimony that the obnoxious acts

were unknown to and unauthorized by the officers of the association, and not required or authorized by its articles or a part of its purposes, and, on the other, there are circumstances which seem to render it strange and improbable that its officers should be in ignorance of his transactions. It is possible that some of the copies of letters which are shown to have been torn from secretary Critchfield's letter-books, of the contents of which he betrays a remarkable and suspicious ignorance, if produced, may have furnished the proof which is lacking, and a lesser quantum of evidence is sufficient to convince our minds, when taken in connection with the sinister presumptions furnished by this circumstance. The executive committee has all of the powers of the board of directors when the board of directors is not in session, and the record indicates that these powers are largely confided to secretary Critchfield. The articles provide that the secretary shall have "full voice" in the management. The members of the executive committee have interfered with him but very little, and yet they are so related to him and to the conduct of his business as secretary of the association that we think they are chargeable with notice of his doings. It seems that the board of directors and executive committee had frequent meetings at his office, which was the office of the company. It was their duty to know what he was doing and how he was managing the affairs of the combination. Copies of a part, at least, of the letters sent out by him were in the office, but no one seems to have inquired into his procedure. The powers of the secretary were great. He seems, in fact, in many particulars to have embodied for the most of the year the entire energies of the association. He makes up the list of the members, strikes them off, and adds to the list those that are regular and pay their dues. The list is published twice a month and sent out to all the members. The language of the secretary in his letters and in his private conversation is in entire harmony with his statements to the members themselves at their annual meeting,

and these statements show that he is personally active in protecting the interests of the members as they are defined in their articles. We are of the opinion that the directors of the association, its executive committee, and the members, who participate in and who are furnished with the report of those meetings, are chargeable with notice of the character of the secretary's work and of what he is doing.

The association has many purposes and activities which seem to be entirely proper and to furnish good, legal, and sufficient reasons for its existence. It has provided an insurance scheme for its members whereby fire insurance is furnished at a reasonable rate. It provides for the settling of disputes between the wholesaler and its members over the grades of lumber and other building material. It has taken up the question of demurrage with the railroad companies on behalf of its members, has endeavored to secure reasonable freight rates, and holds annual public meetings in which papers are read and discussions had of general interest to the lumber trade. Many lumber dealers, including the officers of the association, testify positively there are no rules, restrictions or understanding restricting their right to buy and sell where, when and to whom they please. They make no secret of the fact that they think it "not good ethics" to buy from a wholesaler who sells to their customers in competition with them. This is not a violation of any law, if done by a single individual upon his own account, but, under the drastic and stringent provisions of the statute, if two or more persons make an agreement with each other, or with a third person, to act for the members of the combination in such a manner that the tendency is to prevent or preclude free and unrestricted competition in the sale of goods, it is defined by the statute as a trust, and if its natural and probable effect is to stifle competition or restrain trade it is an unlawful act. We may concede that any statute which would have the effect of driving out of

30

business the retail dealer in the smaller towns and villages of the state would be in its final results a curse, and not a benefit, to the community, but, even if we may doubt the good policy of the extreme and sweeping language of this law, it has been enacted by the legislature, is the law of the state, and we can only determine whether the evidence justifies its application. In the main the purpose of the legislation seems to be wise and in the interests of the people generally. It may be that experience will show defects in its operation and results that proper amendment may remedy.

We are inclined to agree with the attorneys for the defendants that, unless the case falls within the language of the statute, no unlawful act has been committed, and the cases cited in their brief, considered aside from the statute, would be in point. But by section 1 of the Gondring act (Comp. St. 1907, ch. 91a, Ann. St. 1907, sec. 12000), it is declared to be a trust for two or more persons "to create or carry out restrictions in trade," or "to make or enter into, carry on or carry out any contract, obligation or agreement of any kind or description, * * * with intent to preclude, or the tendency of which is to prevent or preclude a free and unrestricted competition among themselves or others or the people generally in the production, sale, traffic or transportation of any such article of merchandise, product or commodity, or conducting a like business or by which they shall agree to pool, combine or unite any interest they may have in connection with the sale, production or transportation of any such articles of merchandise, product or commodity or the carrying on of any such business, that its price might in any way be affected thereby." Under the provisions of the law, we are of the opinion that the acts of secretary Critchfield recited, as well as those related hereafter, were of such a nature as to stifle competition and to operate to restrain trade, and were unlawful, and that the officers and directors of the association were properly chargeable with knowledge of his acts, though they did not actively par-

State v. Adams Lumber Co.

ticipate therein, and that secretary Critchfield, the association and its officers should be restrained from a continuance of the unlawful practices heretofore indulged in. We find no warrant in the evidence, however, and no power in the law to justify the court at this time in dissolving the association or enjoining its proper and legitimate activities.

2. The second branch of the case is concerned with local combinations. The referee finds substantially that on and previous to the first day of May, 1904, the Barnett Lumber Company, a defendant, combined with a non-defendant for the purpose of regulating the prices of lumber and other building material and for the division of trade in the city of McCook and adjacent territory, and that by means of such combination they did control such prices. The referee also finds evidence tending to prove like combinations within the counties of Seward, York and Cass, but finds that the evidence fails to connect the defendant association with such combinations. The finding as to the Barnett Lumber Company seems to be supported by the evidence, and, though the Bullard company is not a defendant in the case, the charge in the petition covers conspiracy or combination with "persons unknown."

With regard to the finding as to Cass county; early in 1905 there were two lumber yards situated in Weeping Water, one owned by Charles Odwarker, the other by the firm of Whitten & Newcomb. Both names are printed in the 1905 list of members of the association as members at Weeping Water. It seems that between January and April there had been some friction between the two dealers, and upon the suggestion of Mr. J. C. Newcomb, one of the members of the firm of Whitten & Newcomb, who lived at Friend, Odwarker, who lived at Weeping Water, met Newcomb at the office of Bird Critchfield, the secretary of the Nebraska Lumber Dealers Association in Lincoln. Critchfield testifies they came to the office and said they had been selling lumber

for less than it cost them, and wanted to know if he could not help them about getting together. He testified that they asked him if he would not write out what is known as the "pound arrangement"; that Newcomb tried to tell him something about it, and that he said he could and would do so, while Odwarker testifies that Critchfield suggested in this conversation "that the fair way to divide the business was to divide on the weight, and if one man got any more than the other of course he would have to make it right with his competitor"; that Critchfield explained the manner of operation, and a few days afterwards sent him a memorandum of agreement. This memorandum, in substance, provides that the railroad weights of all material which each dealer receives on and after May 1, 1905, shall be the basis for settlement and division of trade; that each dealer shall pay into a common fund, which shall be equally divided, 24 cents a hundred pounds for all lumber, lath and shingles received during the previous month, 12 cents a hundred pounds on all lime, cement, etc., and $3 a hundred pounds on sash, doors, etc. Competitive bills that are figured at more than one 'yard shall be divided as nearly equal as possible, and it is agreed that each dealer will meet at the office of .............. on the first Monday night of each month and make full settlement of all business done the previous month. It is clear that such an agreement, if entered into, would be a plain vi. ation of the statute. Odwarker says he was told by Critchfield in the conversation at Lincoln that the plan had been adopted by several dealers in different localities and that it was customary to divide the territory. After the receipt of the memorandum Odwarker withdrew from the association. No agreement was entered into between him and his competitor, and he has not been a member of the association since, so that in fact the attempted agreement and combination to divide profits was never consummated. There is evidence, however, to show that there was a local lumber dealers' organization in Cass county

which established prices and sent price lists to the different dealers in the county, and that Odwarker had been a member of a committee to fix prices. It appears that Critchfield went to Weeping Water and suggested to the manager of Odwarker's yard several plans and methods by which a division of profits could be made, particularly recommending the method of paying according to weight. It would seem, however, that his recommendations were never adopted, and that in that locality there has been fierce competition and a strenuous fight for business since. The conversation alluded to occurred in July or August, 1904, before the passage of the present law. By the attorney general this testimony is taken to mean that Odwarker was a member of a committee of the Nebraska Lumber Dealers Association upon fixing prices. We think it establishes that he had been a member of a committee of local lumber dealers in Cass county, and that such attempted price adjustment as was made was made between local dealers without the co-operation of the Nebraska Lumber Dealers Association or its officers or members as such, though its prices were transcribed into a blank price-book prepared and sold by Critchfield individually. We think, therefore, that the referee's finding as to Cass county is sustained by the evidence.

Documentary evidence was offered that a lumber dealer at Aurora, Nebraska, not a member of the association, and not a defendant in this case, suggested to the Rogers Lumber Company of York, Nebraska, that they had a bill left with them by a person who lived at or near York to be figured, and that if the York lumber dealer would send them a copy of the bill that they were figuring on, or if they could tell whether or not it was the same bill, they would then quote him a figure and would "try to protect" the Rogers Lumber Company's figures. Further documentary evidence was offered to show that in April, 1906, Moore & Hunsaker, lumber dealers at Stromsburg, Nebraska, inquired of the Rogers Lumber Company at York whether a man who formerly lived in York had left

a bill with them to be figured, and that they afterwards
sent the Rogers Lumber Company a copy of the bill with
the price quoted, and suggested the price which the
Rogers company make to the customer.  All these letters
were found among the files of the Rogers Lumber Com-
pany, and were produced in answer to a subpoena *duces
tecum*.  Their introduction in evidence was objected to by
the defendants for various reasons, principally for want
of identification.  The objections were sustained, and the
documents excluded.  Some of these letters were prop-
erly excluded; but, as to the two letters above referred
to, we think the referee should have taken them into con-
sideration.  They were written upon the letter-head of the
lumber dealer, were addressed to the Rogers Lumber
Company, and were found in its letter-files.  They bear
upon their face certain indicia and marks of genuineness
which we think entitled them to be considered.  Under
this testimony the acts of the parties writing the letters
contravened the statute, and the state's exceptions to this
portion of the fifth finding is sustained, and the injunc-
tion allowed as to them.

As to Seward county, the witness Bernicker testified
that he had worked for the Rogers Lumber company at
Seward up to July, 1906; that in the early part of that
year some of the officers and representatives of the various
lumber companies doing business in Seward county met
at the Lindell hotel in Lincoln and agreed upon a scale
of prices for that county, and that the prices were fixed
at different meetings prior to July of that year; that
after these meetings the practice was to figure bills high
to customers of other yards.  He further testified that
the practice ceased in July, 1906.  He does not testify
that Mr. Critchfield or any officer of the Nebraska Lum-
ber Dealers Association knew anything about these
meetings.  Two of the persons named by him as being
present at the meetings testified that there had been a
meeting at the Lincoln hotel in Lincoln, at which they
were present; that they talked about the lumber business

generally and about prices, but that no price list was issued afterwards; that no limitations were made as to territory, and that nothing was said about maintaining prices. This suit was begun in April, 1906, so that if there was an agreement existing it was in operation at the time the action was begun. Several of the persons named as present at these meetings have not appeared to deny the statement of the witness Bernicker. No one speaks for Mr. Lewis, Mr. DeBolt, Mr. Erford, or Mr. Cocklan, who were each present at at least one meeting, according to the testimony of Bernicker. We think the preponderance of the evidence shows that meetings took place as related by Mr. Bernicker, and that the temporary injunction as to the defendants who were present or represented at the meetings should be made permanent. These are the Staplehurst Lumber Company, Erford, manager, P. D. Smith Lumber Company, A. E. Stratton, manager, Searle & Chapin Lumber Company and Rogers Lumber Company. The exception of the state, therefore, to the portion of the fifth finding with reference to Seward county is sustained.

As to Red Willow county, there is testimony as to a conference between one of the officers of a lumber company doing business at McCook and an officer of a company doing business at Arapahoe and Bartley, at which Critchfield was present, but we think the preponderance of the evidence does not establish the fact of an unlawful combination between these defendants, and the finding of the referee is sustained as to this. The attorney general argues that "each member of a conspiracy to restrict trade is answerable for all the acts and declarations of every other member in furtherance of a common design, and the evidence that the defendants fixed prices and divided territory is conclusive," citing *Farley v. Peebles*, 50 Neb. 723; *Chicago, R. I. & P. R. Co. v. Collins*, 56 Ill. 212; *Commonwealth v. Waterman*, 122 Mass. 43, and urges that these instances prove the larger combination. If the acts of the defendants in the several counties men-

tioned had been a part of a general plan, conspiracy or combination to fix prices or divide territory covering the whole state, then the principles he invokes would apply, but we do not think the evidence justifies such a conclusion. We think it shows that these instances were sporadic in their nature, and each local combination or attempted combination was no part of a general plan. Construing the facts disclosed by this testimony as to local combinations in the several counties, we are satisfied that the proof fails to establish that the Nebraska Lumber Dealers Association, as an association, attempted to fix prices or divide profit, or that it prescribed any price list or sale by which its members should regulate the cost to the consumer of the various articles in which they dealt, or that it prescribed territorial limits in which sales should be made by its members. Wherever such agreements have been shown to exist the defendants who participated in them are justly subject to the restraining power of the court to prevent their continuance of such unlawful practices, regardless of the fact whether they are members of the association or not.

We think the association is not to be held accountable for isolated acts or local agreements entered into between dealers, some of whom were members and some of whom were not members, any more than the organization of a church is to be held responsible for intolerant, oppressive or fraudulent acts indulged in by certain of its members, and, if the only evidence affecting the association were that produced upon this branch of the case, we would be compelled to sustain the conclusions of the referee.

In conclusion, we are satisfied that the conclusions of the referee are sound with respect to the lack of participation of the association in the fixing of prices or the restriction of territory within which sales might be made by local dealers. We think, however, that he has failed to give sufficient weight to the fact that the officers of the association were properly chargeable with knowledge of Critchfield's official acts as secretary, and, also, to the

facts which have been disclosed with reference to local combinations and agreements to restrict trade and for the dividing of territory. We think, also, that several defendants not named by him have been shown by the evidence to have joined or taken part in such combinations. We are of the opinion that the exceptions of the state to the findings of the referee which are inconsistent with these conclusions should be sustained, and that an injunction should be allowed perpetually enjoining and restraining Bird Critchfield as secretary of the Nebraska Lumber Dealers Association from carrying on the practices which are in this opinion declared to be unlawful, and as prayed in the sixth paragraph of the prayer in the petition, and enjoining and restraining the Nebraska Lumber Dealers Association, its directors, executive committee, and officers from permitting or allowing the said Critchfield or his successors as secretary of said association, or any of its officers to perform or do any act in its behalf or on behalf of its members, the tendency of which is to prevent and preclude free and full competition in the sale of lumber and building materials in the state f Nebraska, or to stifle competition or restrain commerce in such articles within this state.

It is insisted as to some of the defendants who are not members of the association that they are not subject to any of the results of this action, for the reason that at the times mentioned they were not members of the defendant association. This contention is based upon the idea that the sole purpose of this action is the dissolution of the association and the procuring of an injunction directed against it and its officers and members. We do not so understand the purpose of the suit. The action is brought against a large number of corporations, partnerships and individuals, charging them with combining with each other for the purpose of restraining trade and commerce in lumber and building materials and attempting to monopolize the same within the state, and for dividing the same in certain localities, and charging that

it was further understood by and between the defendants
and members of the association that such members as
had lumber .yards in the same city or village should
charge to the consumer the same price for lumber and
building materials.  We think these allegations are suffi-
cient to justify the exercise of the restraining power of
this court over such of the defendants as the evidence
shows have participated in such unlawful practices, with-
out reference to whether the whole body of defendants
have been guilty of such practices or not, or whether the
wrongdoers were or were not members of the Nebraska
Lumber Dealers Association.

The defendants Moore & Hunsaker, Rogers Lumber
Company, Searle & Chapin Lumber Company, P. D.
Smith Company, Staplehurst Lumber Company and the
Barnett Lumber Company, therefore, should be enjoined
as prayed in the sixth paragraph of the prayer of the
petition.  As to the defendants Bowman-Kranz Lumber
Company, George A. Hoagland, and Thomas Ostergard
& Company, the findings of the referee are sustained.

JUDGMENT ACCORDINGLY.