UNITED STATES v. HOLLIS et al.

(District Court, D. Minnesota, Fourth Division. March 14, 1917.)

No. 1079.

MONOPOLIES ⬤⟹29—ANTI-TRUST ACT—COMBINATION OF RETAIL LUMBER DEALERS.

Defendants were members of a voluntary membership association of retail lumber dealers which adopted the practice of making on the first of each year a "customers' list" according to the following plan: By means of circular letters a list was obtained from each member of the manufacturers and wholesalers with whom such member dealt. From such lists was compiled a list of all the customers of each such manufacturer and wholesaler within the association. By exchange with other associations the lists were extended to their territory. The secretary, through reports from members and otherwise, obtained information of "unethical" or "irregular" shipments by such manufacturers or wholesalers, to consumers, co-operative associations or mail order houses and notified their customers, who took the matter up direct with the offending dealer. Information so obtained was also furnished to and published in trade papers. The result, as intended, was to prevent such sales and shipments to outside parties to a large extent. *Held*, that such action on the part of the association and its members was in restraint of interstate commerce, and that defendants were chargeable with conspiring to restrain such commerce in violation of Anti-Trust Act, Act July 2, 1890, c. 647, § 1, 26 Stat. 209 (Comp. St. 1916, § 8820).

In Equity. Suit by the United States against Willard G. Hollis and others. Decree for the United States.

Blackburn Esterline and Clark McKercher, Sp. Asst. Attys. Gen., George N. Murdock, of Monmouth, Or., and C. C. Haupt, U. S. Dist. Atty., of St. Paul, Minn. (Frank M. Locke, of Ashdown, Ark., and F. H. Watson, of Detroit, Mich., of counsel), for the United States.

Lancaster, Simpson & Purdy, of Minneapolis, Minn., and C. D. Joslyn, of New York City (C. C. Boyle and Boyle & Howell, all of Kansas City, Mo., of counsel), for defendants.

BOOTH, District Judge. This is a suit in equity for an injunction brought by the United States against the defendants under the Sherman Anti-Trust Act.

Plaintiff alleges that the defendants at the time of the filing of the bill were, and for several years had been, engaged in an unlawful conspiracy and combination unduly, unreasonably, and directly to restrain certain described trade and commerce among and between the several states and territories of the United States, in lumber and lumber products, in violation of the act of Congress approved July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies."

The bill alleges, and the answer admits, that the lumber trade is, and for many years prior to the filing of the bill has been, divided into the following classes: (1) Manufacturers who operate at various points in the United States, receive logs from the forests, and saw them into

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

various sizes and lengths of timber and lumber required by the trade for building and manufacturing purposes, and ship such products from the points of manufacture by railroad or steamship lines through and into the states of the United States to the various markets where such lumber products are required, and specifically through and into the states of Minnesota, North Dakota, South Dakota, Iowa, and Nebraska. (2) Wholesalers who deal in lumber and lumber products, and are usually located at or near large markets or centers of trade. In some cases the wholesaler maintains a yard for receiving and storing the lumber purchased by him from the manufacturer; in other cases, the wholesaler does not maintain a yard, but handles the manufactured product through orders from customers transmitted by the wholesaler to the manufacturer. (3) Retailers, located in towns and cities, who receive and store lumber purchased either from wholesaler or manufacturer, and sell for building or manufacturing purposes in the city or town where such retail yard is located. (4) Consumers, who are divided into various classes, generally, as follows: (a) The constructing builder. (b) The converter or manufacturer. (c) The United States government, and sometimes municipalities and railroads. (d) The small consumer of lumber for small building, construction, and repair work.

In addition to the foregoing are: (1) Mail order houses, who buy either from wholesalers or manufacturers and sell to all classes of customers. (2) Co-operative associations, who buy for the benefit of their own members only. The latter classes are regarded by some as retailers, by others as consumers, and by still others as separate and distinct classes.

The government charges that the defendants in pursuance of the alleged conspiracy, by various means and methods, have arbitrarily fixed and maintained divisions and classifications of the lumber trade in interstate commerce, whereby such commerce is unreasonably restrained and competition unreasonably prevented; that the purpose and effect of the acts of the defendants, pursuant to said conspiracy, are: (1) To unreasonably eliminate or restrict competition, except as between retail yards, for the trade of (a) contractors and builders, (b) mail order houses, (c) co-operative yards, (d) the ultimate consumer, except possibly some consumers, such as the United States government, railroads, grain elevators, etc. (2) To force the ultimate consumer to buy at retail prices from regularly established and organized retail lumber merchants, recognized by retail associations. (3) To force the ultimate consumer to buy from the regular and recognized retail merchant who is operating a yard in the vicinity where such lumber is to be used. (4) To prevent any wholesale dealer or manufacturer from quoting prices, or selling and shipping to consumers.

The main question in the case is whether at the time of the filing of the bill the defendants were engaged in a conspiracy in restraint of interstate commerce as charged in the bill. The government claims that the conspiracy was formed long before the filing of the bill, and that it has been a continuing one, with activities thereunder, differing in kind at various periods, but all directed to the same unlawful ends.

The defendants by their joint and several answers deny the existence of any conspiracy amongst the defendants at any time, and while admitting certain declarations and activities on the part of some and perhaps all of the defendants prior to 1907, which might be considered of doubtful legality, nevertheless claim and allege that, since the adoption of the new constitution by the Northwestern Lumbermen's Association in January, 1907, not only no conspiracy has existed between the various defendants or any of them, but there have been no acts or declarations on the part of the defendants or any of them the legality of which can be called in question.

In the view I take of the evidence it will not be necessary to determine the question what relief, if any, could be granted if it should be found that defendants or some of them were guilty of conspiracy as charged and with activities as charged, prior to 1907, but if it should be also found that there were no activities under such conspiracy since 1907, but merely the continued existence of the conspiracy potential in restraint of trade, but not actually so. The record does not present that situation.

No review of the thousands of pages of testimony and exhibits introduced in the case will be attempted, but it may be useful to state some of the salient facts disclosed by the evidence.

The Northwestern Lumbermen's Association organized in 1890 is a voluntary membership association, having as members retail lumber dealers in the states of Minnesota, Iowa, North Dakota, South Dakota, and part of Nebraska. In the earlier years wholesale dealers were admitted as honorary members. In the original constitution is found the following:

The title of this association shall be the Northwestern Lumbermen's Association, and it shall have for its object the protection of its members against sales by wholesale dealers and manufacturers, to contractors and consumers, and the giving of such other protection as may be within the limits of the co-operative association.

And in section 3 of the by-laws is found the following, referring to sales by wholesale dealers to consumers:

If the manufacturer or wholesale dealer refuse to abide by the decision of the board of directors, it shall be the duty of the secretary to notify the members of the association of the name of such wholesale dealer or manufacturer. If any member continues to deal with such wholesaler or manufacturer, he shall be expelled from the association.

Also the following:

It shall be contrary to the spirit of this organization for one retailer who may be a member of this organization to ship lumber in car lots into the territory of any other retailer who may also be a member of this association.

Also:

The secretary shall prepare and cause to be published every three months, a list of all the members of this association, both active and honorary, and mail the same to all retailers. Also the list of all wholesale dealers and manufacturers of lumber who shall refuse to comply with the rules prescribed in section 3 of the by-laws, and mail one of each of such lists to the members of this association.

Also:

It shall be competent for this association to exchange its black list for a similar list of wholesale dealers who may be reported, as provided for in section 3 of these laws, with any other association, which may have a membership in whole or in part in the territory covered by this organization. The spirit of this section being that there shall be reciprocity between associations whose object shall be the protection of retailers against wholesalers selling to contractors and consumers.

Changes in the constitution and by-laws were made from time to time.

In 1895 in a declaration of principles occurs the following:

We seek to establish the equitable principle that the retailer shall not be subjected to competition with the parties from whom he buys, that a fair opportunity shall be offered the man who invests his time and money in the retail business, and assumes the risk which such business inevitably involves, to earn an adequate remuneration for his labor and the use of his capital. We also seek to promote that spirit of harmony in the trade which shall prompt every retail dealer to maintain friendly relations with his competitors at home, and his brother retailers everywhere.

Among the by-laws at this time are the following:

The secretary shall prepare and cause to be issued as often as once each month, what shall be known as the "original bulletin" which shall contain a record of the facts in connection with all claims which shall come to his office. The "official bulletin" shall be mailed under sealed covers only to active members of this association for their private and confidential use, and no case shall be reported therein until the shipper is first given a reasonable opportunity to explain his position in the matter. The "official bulletin" shall also contain a list of those not in harmony with this association as provided in section 3 of these by-laws, a list of those against whom there are unadjusted complaints and a complete list of members of this association, both active and honorary.

The secretary shall also send a complete list of the members of this association to all manufacturers of or wholesale dealers in lumber who ship into the territory covered by this association as often as shall be deemed necessary by the board of directors.

In the constitution of 1897 the following appears:

"It shall be contrary to the spirit of this association for any of its members to make or cause to be made shipments into the legitimate territory of members of other associations of retail lumber dealers, and members who shall so offend shall be subject to such discipline as may be provided in the rules of this association.

Any person or persons, whether carrying a stock of lumber or not, making a practice of quoting prices, selling or shipping (to other than regular dealers) lumber, sash, doors, etc., into territory under the protection of this association. where said person or persons have no yards, shall be designated as "poachers." When said poachers are reported in the membership list and notification sheet they will be considered as consumers at points other than where they may own yards, and any wholesaler or manufacturer, or their agents, making sales or shipments to said parties into the territory of any member of this association after being thus reported, will be considered as having sold or shipped to a consumer.

In 1901, a new constitution and declaration of principles was adopted containing the following:

We recognize the right of manufacturers and wholesalers to sell in whatever market, to whatever purchaser, and at whatever price they may see fit.

We claim for ourselves, both individually and collectively, the right to buy of such manufacturers or wholesalers or their agents, as we may prefer, and to refrain from buying of those who disregard the equities of the trade to our injury and the demoralization of the retail lumber business.   *   *   *

The sole purpose and object of this association shall be to keep its members constantly informed of those manufacturers and wholesalers who may persist in selling at retail in competition directly or indirectly with any member of this association, to the end that members hereof may refrain from dealing with such manufacturers and wholesalers and their agents, if they or any of them so elect or desire.

### Membership.

Any person, firm or corporation within the territory of this association regularly engaged in the retail lumber trade, carrying an assorted stock of lumber, sash, doors and other building material, reasonably commensurate with the demands of his community, shall be considered a retail lumber dealer and be eligible to membership in this association.

Further changes were made in the constitution in 1903. In this constitution, in article VII, appears the following:

*Reports to Secretary.*—Any member of this association having knowledge of a sale by a manufacturer or wholesale dealer or his agents, to a consumer, within the territory of such member, may notify the secretary of this association in writing, giving as full information in reference thereto as practicable.   *   *   *

Upon receipt of such written notice, the secretary shall immediately verify such report so far as practicable, and under the direction of the board of directors, shall notify the members of the association of such sale or sales or shipment by such manufacturer or wholesaler.

In the constitution of 1903 appear also the following provisions:

### Article III.   Limitations and Restrictions.

Section 1. No rules, regulations or by-laws shall be adopted in any manner stifling competition, limiting production, restraining trade, regulating prices, or pooling profits.

Sec. 2. No coercive measures of any kind shall be practiced or adopted toward any retailer, either to induce him to join the association, or to buy or refrain from buying of any particular manufacturer or wholesaler. Nor shall any discriminatory practices on the part of this association be used or allowed against any retailer for the reason that he may not be a member of this association, or to induce or persuade him to become such member.

Sec. 3. No promises or agreements of any kind shall be requisite to membership in this association, nor shall any penalties be imposed upon its members for any cause whatsoever.

Whether these latter provisions were seriously intended to substantially change the aims and purposes or the methods of the association may well be doubted in view of the activities which the evidence shows were still carried on under this constitution. One of the secretary members of the Lumber Secretaries Bureau of Information (one of the defendants herein), in writing to a brother secretary in May, 1903, in reference to certain similar changes in the constitution of his association, uses the following quaint language:

A number of our members have asked me what we propose to do since we wiped out all penalties and obligations, and I have answered all of them that every dealer in lumber who is a member of the association has been in business long enough to know just what the object of the association is, and that we propose to protect our members in the same old way as we have

been doing, and that it is not necessary to put it down in black and white in our constitution and by-laws, and I have found that they have all been satisfied with the change and feel a good deal freer. since we have wiped out all semblance of anything that might be construed by a prejudiced judge as in conflict with the anti-trust laws of our several states.

In 1906–07, the constitution was amended by striking out from the membership clause above quoted the words "considered a retail lumber dealer, and be."

In 1906–07, the constitution was further amended by eliminating article VII relating to "Reports to Secretary."

In the declaration of purpose occurs the following: .

We also recognize the disastrous consequences which result to the legitimate retail dealer from direct competition with wholesalers and manufacturers, and appreciate the importance to the retail dealer of accurate information as to the nature and extent of such competition where any exists.

And recognizing and appreciating the advantage of co-operation in securing and disseminating any and all proper information for our mutual convenience, benefit or protection, we have organized this association. and have adopted the following articles for the government of our affairs.

Among the articles is the following:

The object of this association is and shall be to secure and disseminate to its members any and all legal and proper information which may be of interest or value to any member or members thereof in his or their business as retail lumber dealers.

A consideration of the provisions of the several constitutions and by-laws of which portions are quoted above, in connection with other evidence in the case, leads to the conclusion that among the purposes of the association, at least prior to 1907, were the following: To eliminate competition, except as between retail yards for the trade of the consumer; to force the consumer to buy from a regularly organized retail dealer operating a yard in the vicinity where such lumber was to be used, and to prevent the wholesale dealer or manufacturer from selling direct to the consumer.

Various means and methods to bring about the desired results were tried during the period prior to 1907. Expulsion of members, black lists of offending wholesale dealers, fines and penalties for offending members; co-operation with other similar associations and the exchange of black lists and other information; furnishing of information to lumber credit agencies touching the status of various persons, firms or corporations, whether they should be classed as retailers, co-operative yards, consumers, or otherwise; publication, alone or in co-operation with other similar associations, of a handbook for the lumber trade, containing among other things a list of manufacturers who sold to consumers direct, and other nonethical dealers; formation of the Lumber Secretaries' Bureau of Information for the purpose of co-operation between the different associations of retail lumber dealers, in carrying out the aims and purposes above enumerated.

The defendant the Lumber Secretaries' Bureau of Information was incorporated in 1902. It grew out of a prior voluntary association known as the Secretaries' Association. Its membership consisted of the secretaries of the various retail lumber associations as representing

the associations themselves. During this period the membership increased until 15 associations were represented. The Northwestern Lumbermen's Association was included from 1902 to 1906, and from 1909 continuously.

Article III of the constitution of said bureau is as follows:

The object for which this bureau is formed is to supply its members with any and all information which may legitimately come into its possession which may be of value or interest to said subscribers.

In December, 1902, a series of resolutions was recommended by said bureau for adoption by the constituent members of the several Retail Lumber Dealers' Associations. Among said resolutions were the following:

Whereas, there are certain manufacturers and jobbers in lumber who seek our trade, and whom we have patronized liberally who are also seeking the trade of, or are supplying the so-called "poachers" who are invading our territory with catalogues and other demoralizing literature, and who make a business of selling direct to the consumers; and

Whereas, some manufacturers and jobbers in lumber habitually ship lumber to their customers to points where said customers have no yards, and who in fact are "peddlers"; and

Whereas, some manufacturers and jobbers in lumber, with no regard for the interests of the retail lumber trade, sell and ship direct to consumers, and also to aggregations of consumers organized as so-called "co-operative yards"; and

Whereas, we do not consider such practices to be good ethics, and the lumber trade in general is not in any manner benefited thereby:

Be it therefore resolved, that we, the undersigned, in convention assembled, together with any other of our members who may indorse these sentiments and sign with us, do hereby request the secretary of this association as often as once in every sixty days, or at such periods as may be found to be the most practicable, either through his own office or through the Lumber Secretaries' Bureau of Information, to notify us of all such cases as may come to his official notice, that we may thereby be kept fully informed and better enabled to distinguish foes as well as friends.

And be it further resolved. that our secretary be requested to co-operate with the secretaries of all other state and interstate retail lumber dealers' associations, through the Lumber Secretaries' Bureau of Information, to the end that we may have this information from all retail territory.

Among the activities of the Lumber Secretaries' Bureau of Information was the publication of a bulletin or report published and distributed as outlined in the above resolution. This publication began as early as 1903, and continued as late as 1908.

In December, 1903, said bureau adopted further resolutions, and, among others, the following:

To co-operate with the Eastern States Retail Lumber Dealers' Association, an eastern body corresponding to the Lumber Secretaries' Bureau of Information.

To approve the plan of use of "customers' lists" proposed by the said Willard G. Hollis, as hereinbefore described.

To secure reciprocity agreements with the Sash and Door Manufacturers' Association and with the National Lumber Manufacturers' Association.

Statement has been made by counsel for defendants that the Lumber Secretaries' Bureau of Information has since the commencement of this suit terminated its existence. Attention has not been called

to anything in the record establishing such to be the fact, and the government has not admitted it. If deemed advisable, evidence on the matter may be offered before entry of final decree.

In 1890, the Mississippi Valley Lumberman, a weekly newspaper published in Minneapolis, was made the official organ of the Northwestern Lumbermen's Association, and this paper continued to be such official organ, though without formal vote after the first one, until January, 1894, when the Northwestern Lumberman, a Chicago publication, was made the official paper for that year. By arrangement made with the latter paper, the association was entitled to one page per week in said paper over the signature of the secretary for such official communications to members as he might choose to make.

The effect of these various activities during the period prior to 1907 is shown. Among other evidence are the statements made from time to time by the members of the association and the Lumber Secretaries' Bureau. In 1903, the president of the association in his annual address said:

We are to-day acting in unison with fifteen other retail associations representing 5,000 yards, making with our own a total of 7,200 yards, covering territory extending from the western slope of the Alleghenies on the east to the eastern slope of the Rockies on the west, and from Winnipeg down to the "Sunny South by the Sea." In this vast territory it is estimated that of all the lumber used in the building trades, 94 per cent. of it is confined to its proper channels, reaching the consumer through the retail yards. Possibly this estimate is too high, but it is beyond doubt that the great bulk of irregular shipments have been cut off through the well-directed forces of united effort. * * *

The idea that in union there is strength has crystallized fifteen retail associations into one central organization. (The Lumber Secretaries' Bureau of Information.)

In 1905 Mr. Ewing at the annual meeting said:

I have been on the board for a number of years, ever since the organization of the association. * * * I want to say, gentlemen, that if this association would go out of existence to-day our whole territory would be covered with men selling lumber to consumers from all the markets of the northwest direct. You could not keep on your feet. This association has given you more protection than you have ever dreamed of. You want to make it still stronger. We can if you will do your duty and not buy lumber from men that are not in sympathy with us.

Indeed, it is not necessary to go outside of the pleadings to determine the purposes of the defendants, the methods employed by them, and the effect produced during the period prior to 1907.

The answer admits the substance of the allegations of the bill as to these matters; but, though making this admission, defendants deny that there was a conspiracy amongst the defendants or any of them.

A careful consideration of the record, however, leads to the conclusion that if suit had been brought in 1906, and the same admissions and evidence been introduced that are now before the court touching the period prior to 1907, the government would clearly have been entitled to injunctive relief.

It is but fair to add that the adoption of its original constitution by the Northwestern Lumbermen's Association was prior to the passage

of the Sherman Anti-Trust Act; and that many of the activities of this earlier period were thought to be sanctioned by the decision in Bohn Mfg. Co. v. Hollis et al., 54 Minn. 223, 54 N. W. 1119, 21 L. R. A. 337, 40 Am. St. Rep. 319.

Turning next to the period subsequent to the adoption of the 1907 constitution:

As heretofore noted, certain changes are found in the constitution of 1907. The definition of who should be considered retail lumber dealers has been eliminated. Article VIII of the constitution as it existed in 1903, relating to reports to the secretary of the association by members thereof, touching sales by manufacturers and wholesalers direct to consumers, is also eliminated. In fact, if the constitution of 1907 be considered by itself alone, it affords no substantial basis to sustain the charge of conspiracy alleged in the bill.

Turning now to the activities of the defendant association subsequent to the adoption of the constitution of 1907, it is found that certain of the activities of former years are no longer continued. Expulsion of members, penalties imposed upon members for offenses contrary to the provisions of the constitution or by-laws, are eliminated, so far as the defendant association is concerned.

It is claimed on the part of the government, however, that with the discontinuance of certain activities others were introduced to take their place, and that these new activities should be considered, not merely with reference to the new constitution, but in the light of the whole prior history of the defendants; and that, when so considered, the new activities are found to be inspired by the same purposes, directed to the same ends, and effective to a substantial extent in accomplishing those ends.

Among the activities subsequent to the adoption of the 1907 constitution are the uses made of certain lumber trade publications. "The Scout," a trade publication of Detroit, Mich., is one of these. This publication was made the official organ of the defendant Northwestern Lumbermen's Association for the year 1909. In its columns were published by the secretary of the association lists of wholesalers and manufacturers who made sales which were considered unethical or irregular. In May, 1909, the secretary of the association, in writing to an alleged unethical manufacturer, recites some of the various means theretofore employed in advancing what he calls "the association idea." Among other things, he mentions: (1) Honorary membership for wholesalers and manufacturers in the retail association. (2) Buyers' guide for distribution among the members of the retail association containing advertisements of the manufacturers. (3) The sending of a monthly sealed letter. (4) Establishment by the Mississippi Valley Lumberman of its publicity department. (5) The plan of using the Scout as a medium of conveying to the membership of the association information regarding sales to mail order houses and to others not regular retail dealers. This use of the Scout was discontinued after a trial of one year.

In May, 1908, a conference between certain representatives of the various branches of the lumber trade was held at Tacoma. The Northwestern Lumbermen's Association was represented, and a call was

issued for a subsequent national conference to be held at Minneapolis in June, 1908, immediately following the convention of the National Lumber Manufacturers' Association. This lumber trade congress was held, and delegates from 30 lumber associations were present, including those from the Northwestern Lumbermen's Association. At this congress a code of ethics was adopted, which was thereafter also adopted by said Northwestern Lumbermen's Association. Among the articles in the new code of ethics appeared the following:

It should be the duty of the manufacturer and wholesaler to take an active interest in the marketing of their products through regular channels only. * * * It is the sense of the conference that the widest trade publicity be given for the purpose of making known irresponsible, irregular and unscrupulous dealers and manufacturers.

This last provision was changed in 1909, by substituting the word "unethical" in place of the word "irregular." This code of ethics continued in force without material change at the time of the commencement of the present suit.

The evidence also shows that during this period the secretary of the Northwestern Lumbermen's Association from time to time furnished information and advice to the lumber credit agencies in reference to the classification, not only of members of the association itself, but of other dealers, as to whether they should be classified as co-operative yards, retail dealers, consumers, or otherwise. It is to be borne in mind, in this connection, that the lumber credit agencies lists were in constant use by wholesalers and manufacturers.

The issuance of an official bulletin or official report by the Lumber Secretaries' Bureau of Information continued during the years 1907 and 1908. The method of its compilation and use was as follows: A retail lumber dealer, learning of a sale by a wholesaler to a consumer, would make complaint in writing to the secretary of the association to which the retailer belonged. The secretary would thereupon take the matter up, ascertain the facts in regard to the matter complained of, and submit his report to the board of directors of the Lumber Secretaries' Bureau of Information. This body determined whether the matter should be reported in the next issue of the bulletin, and instructed the secretary accordingly. The bulletin when issued was distributed among the members of the several associations. It should be noted, in connection with this matter of the bulletin, however, that the secretary of the Northwestern Lumbermen's Association resigned from the Lumber Secretaries' Bureau of Information in the spring of 1906, and did not again become a member of said bureau until 1909.

Among the activities of the Northwestern Lumbermen's Association during the period subsequent to 1907 was the use of "Customers' lists." This was a plan apparently originating with the secretary of this association, and suggested by him to the secretaries of other similar associations through the Secretaries' Bureau, and adopted by other secretaries to a greater or less extent. Briefly, the plan was this: The secretary of the association at the beginning of each year would send a circular letter to the members of the association, asking for a

list of wholesalers or manufacturers with whom the retailer dealt, and in reference to whom he desired to be kept informed. Upon receiving such lists, the information was rearranged and compiled upon a card index, so as to show the customers of the various manufacturers and wholesalers in the territory covered by the association; and by exchange of lists the information upon this card index would be extended, so as to cover the territory of other associations. Information was then obtained by the secretary of the association as to irregular or unethical shipments by such wholesalers or manufacturers. The two principal sources of such information to the secretary were communications from the members of the association as to irregular or unethical sales which came to their notice in their vicinity, and reports by detectives hired by the association from time to time to make investigation and report to the secretary. The defendant Boyce was largely employed in this work.

Upon the receipt of such information, the secretary would notify customers of the offending wholesaler or manufacturer in regard to the specific unethical or irregular sale. Whether such notice by the secretary should be sent to a few or to many of the customers of the offending wholesaler or manufacturer rested in the discretion of the secretary. In one extreme instance it was sent to 1,200 customers. The customers receiving such information would then take up the matter with the offending wholesaler or manufacturer, protesting against such unethical or irregular shipments. There is no dispute as to the existence and operation of this method, but it is denied by defendants that it was carried out in pursuance of any conspiracy or agreement. It is further strenuously urged that the various members of the association receiving notices from the secretary of unethical or irregular sales by any particular wholesaler or manufacturer were under no obligation or agreement to take any action whatsoever, but the evidence is conclusive that action was taken by the individual members upon receiving the information. In the earlier years of the use of customers' lists, the secretary of the association would himself write directly to the offending wholesaler or manufacturer. This plan was later changed for the one above outlined. The change in method was made for two reasons, according to the testimony of the secretary: First, on account of a decision of the Supreme Court of the state of Nebraska in the case of State v. Adams Lumber Co., 81 Neb. 392, 116 N. W. 302; secondly, because many of the manufacturers resented receiving such communications from the secretary.

A careful consideration of the evidence has convinced me that these two activities, the use of the bulletin and the use of the customers' lists, are not substantially different from the use of the "official report" under consideration in the case of Eastern States Lumber Association v. United States, 234 U. S. 600, 34 Sup. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788. The court in that case said:

The circulation of these reports not only tends to directly restrain the freedom of commerce by preventing the listed dealers from entering into competition with retailers, as was held by the District Court, but it directly tends to prevent other retailers who have no personal grievance against him and

with.whom he might trade from so doing; they being deterred solely because of the influence of the report circulated among the members of the associations.

While, as above noted, the secretary of the association mentions, among other methods used to effect desired ends, the ·establishment of the "publicity department" in the Mississippi Valley Lumberman, "in which Mr. Walker undertook to give fair notice to all the trade of the operations of various pirates and buccaneers in the lumber business," he does not claim that this effort was under the authority or by the direction of the association; nor does the evidence warrant a conclusion that the "publicity department" of the Mississippi Valley Lumberman was under the management or control of the association. It is admitted in the answer, however, that during said period the secretary did from time to time furnish to the Mississippi Valley Lumberman various items of information showing shipments of lumber and lumber products from manufacturers and wholesalers direct to consumer. · Also, it is admitted that both the secretary and the defendant Walker knew and intended that such items should be published in said paper and circulated therein as items of interest to the subscribers of said paper. But it is denied that this was done in furtherance of any conspiracy or combination.

During a portion of this period there appeared in the Mississippi Valley Lumberman in the "publicity department" the standing announcement:

*Selfish Dealers.* That the trade can have an opportunity to become thoroughly familiar with the names of the retail lumbermen who buy from manufacturers who are known to be supplying catalogue houses with material, we reproduce the list once more—followed by a list of dealers.

Also the following announcement:

We again reproduce the list of those who have signed the affidavit certifying that they do not·sell to catalogue houses, nor solicit trade of the consumers in the territory of the legitimate dealers.

The evidence is convincing that the defendant Walker during this period was.zealous in his efforts to carry out the same aims as the association in respect to the lumber trade, that he received from time to time from the secretary of the association information which had been collected by the use of the customers' lists, and that such information was used in the columns of his paper. The fact that he independently gathered other information is not material here.

It is claimed by counsel for defendants that there is nothing in the record indicating that the use of customers'· lists interfered in the slightest way with the channels of interstate commerce. This claim, in my judgment, is not sustained by the record. The purpose and effect of the use of the customers' lists were to coerce wholesalers and manufacturers to refrain ·from selling direct to consumers. The evidence of the secretaries themselves is quite persuasive. The secretary of one of the associations writes to the secretary of the defendant association:

I have sent little or nothing to the Scout for a good many months for, like yourself, I feel that the customers' lists is by all odds the most effective; at least we have always found it so.

The secretary of defendant association replies:

Noting what you say about the effectiveness of the use of the customers' list, I want to say that I quite agree with you that it is by far the best method which has ever been applied.

Again a secretary of one of the allied associations writes:

We have perfected a customers' list now for the last three years at the beginning of the year, and have used it very effectively whenever it was necessary. I am of the opinion that no better results can be obtained than for the Northwestern, Southwestern, Western, and possibly the Illinois Association, to fully perfect a customers' list, so that we can exchange information from time to time. Others will fall in line as time goes on, and I think the very best results will then be accomplished in a quiet and effective way.

The secretary of the Northwestern Lumbermen's Association testified in reference to this matter as follows:

Q. At the time that this customers' list—you were using it in 1908 and 1909 and 1910—when a manufacturer who had been shipping to the consuming trade paid no attention to the letter of the retailer, did you do anything further in the matter? A. I don't recall a single case where a manufacturer did not pay some attention to it.

Q. What do you mean by paying some attention to it? A. Well, he answered the letter, and either explained it in a satisfactory way to this dealer, in a way which satisfied the dealer who had made the complaint, or he indicated that it was a mistaken step on his part and he intended not to do it again and would not do it again, and that was the end of it.

But this is not all. A mass of evidence in the record bears out these statements of the secretaries. The testimony and admissions of manufacturers and wholesalers, of persons connected with mail order houses, of retail dealers, and of consumers, show that these efforts of the defendants were successful to a very considerable degree in restraining such interstate commerce as was considered unethical or irregular, and in restricting interstate commerce to so-called regular channels; that is, from wholesalers and manufacturers to the retailer, and from the retailer to the consumer.

It is true that many of these witnesses as well as others testified that, notwithstanding the efforts of the defendants, they were able to provide themselves with such lumber as they needed, and it is claimed on the part of counsel for defendants that, this being the case, the restraint of interstate commerce, if any, by reason of the methods of the defendants, was merely negligible. In my judgment, this contention is not sound. The test is, not whether by alleged methods carried out in pursuance of a conspiracy some portion of interstate commerce is annihilated, but whether such commerce is substantially interfered with or restrained.

The responsibility of those who unlawfully place substantial obstacles in the legitimate channels of interstate commerce is not lessened by the fact that some of the persons engaged in such commerce are

able by superior agility to surmount the obstacles, and that others by strength are able to break them down.

The court will not feel itself compelled to adjudicate in mathematical terms the extent of the restraint of interstate commerce, if the evidence shows that it is substantial. Nor is it material here that the motives of the defendants in carrying out the activities above described were of the best, and that the acts were inspired by an honest belief that the interests, not only of those engaged in the lumber trade, but of the community at large, would be best served by having lumber and lumber products distributed solely through so-called regular channels. Such matters might very properly be considered by Congress in determining the propriety of enacting proposed legislation. The sole inquiry here before the court at this time, however, is whether the facts disclosed by the record make out a case within the statute already enacted.

In Eastern States Lumber Ass'n v. United States, the court uses the following language:

The argument that the course pursued is necessary to the protection of the retail trade and promotive of the public welfare in providing retail facilities is answered by the fact that Congress, with the right to control the field of interstate commerce, has so legislated as to prevent resort to practices which unduly restrain competition or unduly obstruct the free flow of such commerce, and private choice of means must yield to the national authority thus exerted. Addyston Pipe Co. v. United States, 175 U. S. 211, 241–242 [20 Sup. Ct. 96, 44 L. Ed. 136].

In my judgment, the government has clearly made out a case within the statute, as interpreted in Eastern States Lumber Ass'n v. United States, 234 U. S. 600, 34 Sup. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788, and Lawlor v. Loewe, 235 U. S. 522, 35 Sup. Ct. 170, 59 L. Ed. 341, and is entitled to relief by way of injunction.

It is proper to add that the defendants have, each of them, activities other than those above criticized, of wide range and considerable importance, in reference to which no complaint is made.

The injunction should therefore be against the several defendants, but directed specifically toward the illegal activities heretofore and at the time of the filing of the bill carried on by them in interference with and restraint of interstate commerce, to wit: The use of customers' lists in collecting, compiling, and distributing information, whether to the members of the association, to trade publications, or other newspapers, to credit agencies or to the public at large, as to sales by wholesalers and manufacturers direct to consumers, including mail order houses and co-operative yards.

Decree may be prepared accordingly.